UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

| | | |
|---|---|---|
| ANDRE HAMILTON EL-SHABAZZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:05-cv-17 |
| | ) | |
| v. | ) | HON. ROBERT HOLMES BELL |
| | ) | |
| TODD DUNN, et al., | ) | |
| | ) | |
| Defendants. | ) | **OPINION** |
| | ) | |

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996) ("PLRA"), "no action shall be brought with respect to prison conditions . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Because Plaintiff has failed to demonstrate exhaustion of available administrative remedies, the Court will dismiss his complaint without prejudice.

**Discussion**

I.    Factual allegations

Plaintiff is presently incarcerated at the Baraga Maximum Correctional Facility (AMF). In his *pro se* complaint, he sues Defendants Security Threat Group (STG) Coordinator Todd Dunn, STG Sergeant John Mayotte, Dawn Mayotte, Case Manager Vickie Weisinger, Inspector Daniel Ezrow, Corrections Officer Unknown Bott, Corrections Officer Unknown Ninnis, Corrections Officer Unknown Havela, Corrections Officer Unknown Luokala, Sergeant Bill Etten, Sergeant Unknown Champion and Resident Unit Manager Unknown Niemie.

Plaintiff claims that he is the co-Founder and Supreme Vanguard Minister of a newly formed religion called the "Noatic Voice," which stands for Noatic Vanguard of Islamic & Community Empowerment. Plaintiff states that material sent to him by the Noatic Voice office was not delivered to him. Plaintiff was subjected to harassment by Defendant John Mayotte, as well as other prison officials. On January 3, 2003, Plaintiff was told by the Chaplain that the Noatic Voice religion had not yet been approved by the MDOC, but that it could be practiced individually. In mid-January, Plaintiff was called to the unit office by Defendants John Mayotte and Weisinger, and was interrogated regarding the new religion. Defendant John Mayotte told Plaintiff that he believed the religion was a cover for a gang that Plaintiff had belonged to prior to incarceration, and that it had been designated as an STG.

Plaintiff alleges that on January 21, 2003, "V.O.I.C.E." members brought Noatic Voice religious materials. The materials were to be given to Plaintiff and other registered members of V.O.I.C.E., but Plaintiff never received this material. On February 7, 2003, Plaintiff filed a complaint in this court against Gerald Hofbauer for withholding the material. *See El-Shabazz v. Hofbauer*, Case No. 2:03-cv-28. Plaintiff states that he feared that he would be retaliated against because of this action, as he claims happened to another prisoner. Plaintiff's case was later dismissed for failure to exhaust administrative remedies.

Plaintiff claims that Defendants John Mayotte, Dunn, and Weisinger threatened an inmate into fabricating charges against Plaintiff and other V.O.I.C.E. members, stating that they were involved in prostitution and extortion, in order to justify designating the religion as an STG. Plaintiff states that the Chaplain's clerk was also being harassed for reporting the unlawful actions of Defendants in fabricating stories about the Noatic Voice. On May 9, 2003, Defendant John Mayotte

began threatening individual Noatic Voice members with STG designation. Defendant John Mayotte told Plaintiff that he did not have to worry about seeing the parole board because he would make sure that Plaintiff did not get parole. On May 13, 2003, Plaintiff was moved to another cell block and fired from his job. Plaintiff was placed in a cell between two STG members. Plaintiff began to tell his neighbors about the Noatic Voice and to convince them to leave the gang life and embrace a spiritual life. Defendant John Mayotte discovered Noatic Voice materials with Plaintiff's name on them in another prisoner's cell.

On June 1, 2003, Plaintiff was officially designated as an STG II member for associating with known STG prisoners. Consequently, Plaintiff was automatically denied parole. When Plaintiff requested an explanation, he was told that the information was part of an ongoing investigation and was confidential. On June 13, 2003, Plaintiff and another prisoner were approached by Defendant John Mayotte, who told them three known Vice Lords were members of the Noatic Voice and that he would have no problem convincing the Director to designate the Noatic Voice as an STG. Plaintiff subsequently began to receive letters from Noatic Voice members around the state, seeking spiritual advice and further understanding of the beliefs espoused by the Noatic Voice. These letters were initially read before being given to Plaintiff, and were eventually rejected altogether. Moreover, the authors of the letters were threatened with STG designation.

On July 10, 2003, Plaintiff had a scheduled meeting with another prisoner in the law library. Upon entering the library, Defendant Bott shook down Plaintiff's legal materials, and asked "What's all this gang stuff?" Plaintiff told Defendant Bott that it was religious material, and Defendant Bott stated, "Same thing." While Plaintiff was in the law library, Defendants Bott, Ninnis, Luokala, Havela, Etten and Champion, as well as eight unknown officers, shook Plaintiff's

cell down. Plaintiff states that his property was all over the floor and scattered across the officers' desk following the shakedown. The majority of Plaintiff's property was then packed into a large duffel bag. Subsequently, while Plaintiff was in the shower, Defendant Bott went through Plaintiff's legal materials and removed several items, including materials relating to a civil rights action (2:03-cv-28), exhibits from Plaintiff's criminal case, evidence photographs, and news clippings. Defendant Bott also took all materials relating to the Noatic Voice, such as rosters, addresses, books, files, literature, teachings, and a full membership list.

Plaintiff received a Notice of Intent (NOI), which stated that one duffel bag of suspected STG material was taken from Plaintiff's cell. Plaintiff complains that a proper accounting was never made of the property taken, which prevented Plaintiff from asserting a proper defense. Plaintiff asserts that because the Noatic Voice was not labeled an STG group at the time, there was no reason to believe the confiscated materials were STG related. Plaintiff claims that his property was improperly examined by Defendant John Mayotte prior to the hearing. On July 24, 2003, Plaintiff was called to Defendant Weisinger's office for a hearing, during which Plaintiff's duffel bag was produced. However, Plaintiff claims that most of the contents of the duffel were missing. Plaintiff was told that if he did not like it, he could write a grievance. Plaintiff was told that he would not be getting his property back, but that he could send it home after Defendant John Mayotte was done copying it. In addition, Defendant John Mayotte stated that he had sent a request to Lansing for the Noatic Voice to be designated an STG. Defendant John Mayotte told Plaintiff that because he was a gang member and was listed as a founder and a minister of the Noatic Voice, it must be treated as an STG. Defendant John Mayotte stated that prisoners could not be founders or ministers of a religion. Defendant John Mayotte further asserted that the fact that known members

of the Vice Lords were members of the Noatic Voice also contributed to him seeking to have the group labeled as an STG.

Plaintiff contends that the seizure of all of his Noatic Voice materials prevented him from practicing his religion or from advising other members of the faith. Plaintiff states that during the shakedown, officers took his Holy Quar'an, but left a Bible, stating, "Here, you still got something to pray with." At the conclusion of the hearing on the NOI, Defendant Weisinger stated that the property had been viewed by Defendant John Mayotte, that approximately 20 pounds of the property was returned to Plaintiff, and that the remaining property was confiscated because it contained information on the Vice Lords. Plaintiff claims that his duffel bag was actually returned to him containing no more than some loose papers, a few of his personal letters, and some state issued clothing that did not belong to Plaintiff. Moreover Plaintiff states that Defendant Weisinger never inspected the confiscated property. Plaintiff's grievance on this issue was denied by Defendants Niemi and Trethaway, and his step II appeal was denied by Defendant Hofbauer. Plaintiff eventually discovered that his step III appeal on this issue never left the institution.

On August 22, 2003, Defendant John Mayotte claimed that he had found an address of one of his relatives in Plaintiff's property. Defendant John Mayotte told Plaintiff that if Plaintiff kept "fucking with Mayotte," he would have him "stabbed again," but that this time Plaintiff would be killed. Plaintiff's grievance on this issue was rejected as being too vague. On August 27, 2003, Plaintiff filed a formal complaint against MBP officials with the Department of Civil Service. The complaint was forwarded to the Prisoner Affairs Department of the MDOC, which only caused Plaintiff to be further retaliated against.

On September 11, 2003, Plaintiff was packed up to be transferred. While in the property room, Defendant John Mayotte and his wife, Defendant Dawn Mayotte, began taking items of property and throwing them in the trash. Defendant John Mayotte told Plaintiff that he had been making harassing and threatening telephone calls to free world Noatic Voice representatives in order to encourage them to cease support for Plaintiff and his religion. The Mayottes took pictures, letters and Plaintiff's phone/address book, stating that Plaintiff wouldn't mind them having the book, since Plaintiff had not minded having the Mayottes' address. A NOI was written mentioning the book, and it was kept by the Mayottes, who used it to contact people in the book. Once contacted by the Mayottes, the people listed in Plaintiff's book were told that he was an informant and/or a con-artist, and that they could be investigated as a result of their involvement with Plaintiff, who was a convicted murderer. Plaintiff states that he never received a hearing on this NOI and that MBP officials lied about forwarding the property to AMF.

On September 30, 2003, Plaintiff received notice that the Noatic Voice had been officially designated as an STG, and that Plaintiff had been labeled as an STG member. Plaintiff claims that this designation was improper, and merely relied upon the fact that some of the members of the Noatic Voice were also members of the Vice Lords gang. Plaintiff claims that the STG designation means that he is automatically a level V maximum security prisoner. On September 13, 2004, Plaintiff filed a complaint attempting to assert his claims, but the complaint was dismissed for failure to exhaust administrative remedies. *See El-Shabazz v. Caruso, et al.*, 2:04-cv-186 (W.D. Mich. Oct. 28, 2004).

Plaintiff claims that Defendants' conduct violated his constitutional rights. For relief, Plaintiff requests compensatory and punitive damages, as well as declaratory and injunctive relief.

### II.     Lack of exhaustion of available administrative remedies

Plaintiff has failed to sufficiently allege and show exhaustion of available administrative remedies. Pursuant to 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). The exhaustion requirement is mandatory and applies to all suits regarding prison conditions, regardless of the nature of the wrong or the type of relief sought. *Porter*, 534 U.S. at 516; *Booth*, 532 U.S. at 741. A district court must enforce the exhaustion requirement sua sponte. *Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir.), *cert. denied*, 525 U.S. 833, 119 S. Ct. 88 (1998); *accord Wyatt v. Leonard*, 193 F.3d 876, 879 (6th Cir. 1999).

A prisoner must allege and show that he has exhausted all available administrative remedies and should attach to his § 1983 complaint the administrative decision disposing of his complaint, if the decision is available. *Brown*, 139 F.3d at 1104. In the absence of written documentation, the prisoner must describe with specificity the administrative proceeding and its outcome so that the court may determine what claims, if any, have been exhausted. *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir.), *cert. denied*, 531 U.S. 1040, 121 S. Ct. 634 (2000). A prisoner must specifically mention the involved parties in the grievance to make prison officials aware of the problems so that the prison has a chance to address the claims before they reach federal court. *Curry v. Scott*, 249 F.3d 493, 505 (6th Cir. 2001).

Plaintiff's claims are the type of claims that may be grieved. *See* MICH. DEP'T OF CORR., Policy Directive 03.02.130, ¶ E (may grieve "alleged violations of policy and procedure or unsatisfactory conditions of confinement") (effective Nov. 1, 2000); ¶ II (may grieve brutality and

corruption by prison staff) (effective Oct. 11, 1999 and November 1, 2000); ¶ J (may grieve acts of reprisal for using the grievance process or for assisting others in filing grievances) (effective Oct. 11, 1999 and Nov. 1, 2000).

The burden to allege and show exhaustion belongs to Plaintiff. *See* 42 U.S.C. § 1997e(a); *Knuckles El*, 215 F.3d at 642; *Brown*, 139 F.3d at 1104. This requirement is "so that the district court may intelligently decide if the issues raised can be decided on the merits." *Knuckles El*, 215 F.3d at 642. Plaintiff attaches copies of grievances and responses showing that he exhausted his administrative remedies against Defendants Dunn, John Mayotte, Dawn Mayotte, Weisinger, Ezrow, Bott, Ninnis, Luokala, and Etten. However, Plaintiff fails to show that he ever filed step I grievances naming Defendants Havela, Champion, and Niemie. An allegation that remedies have been exhausted is not enough, as a plaintiff must provide the decisions reflecting the administrative disposition of his claims or other evidence showing that he has exhausted his remedies. *Williams v. McGinnis*, No. 98-1042, 1999 WL 183345, at *1 (6th Cir. March 16, 1999). The Sixth Circuit has found that the district court is not required to hold evidentiary hearings on the issue of exhaustion or "spend a lot of time with each case just trying to find out whether it has jurisdiction to reach the merits." *See Knuckles El*, 215 F.3d at 642. Accordingly, the Court finds that Plaintiff has failed to demonstrate exhaustion of available administrative remedies with regard to Defendants Havela, Champion, and Niemie.

Because Plaintiff's complaint contains both exhausted and unexhausted claims, the Court will dismiss his action pursuant to the "total exhaustion" rule. Under the total exhaustion rule, the presence of an unexhausted claim results in the dismissal of the entire action. *Jones Bey v. Johnson, et al.*, 407 F.3d 801 (6th Cir. 2005). Dismissal of this action without prejudice is

appropriate when a prisoner has failed to show that he exhausted available administrative remedies. *See Freeman*, 196 F.3d at 645; *Brown*, 139 F.3d at 1104; *White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997). Dismissal for failing to exhaust available administrative remedies does not relieve a plaintiff from payment of the civil action filing fee. *Omar v. Lesza*, No. 97 C 5817, 1997 WL 534361, at *1 (N.D. Ill. Aug. 26, 1997). Accordingly, the Court will dismiss Plaintiff's action without prejudice.

## **Conclusion**

Having conducted the review now required by the Prison Litigation Reform Act, the Court will dismiss Plaintiff's action without prejudice because he has failed to show exhaustion as required by 42 U.S.C. § 1997e(a).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $255 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $255 appellate filing fee in one lump sum.

A Judgment consistent with this Opinion will be entered.

Date:   February 13, 2006               /s/ Robert Holmes Bell
                                        ROBERT HOLMES BELL
                                        CHIEF UNITED STATES DISTRICT JUDGE