UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANDRE HAMILTON EL-SHABAZZ,

    Plaintiff,

v.                                                             Case No. 2:05-cv-17
                                                             HON. ROBERT HOLMES BELL

TODD DUNN, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff prisoner Andre Hamilton El-Shabazz is presently incarcerated at the Marquette Branch Prison. In his *pro se* complaint, he sues Defendants Security Threat Group (STG) Coordinator Todd Dunn, Security Threat Group (STG) Sergeant John Mayotte, Dawn Mayotte, Case Manager Vickie Weisinger, Inspector Daniel Ezrow, Corrections Officer Unknown Bott, Corrections Officer Unknown Ninnis, Corrections Officer Unknown Havela, Corrections Officer Unknown Luokala, Sergeant Bill Etten, Sergeant Unknown Champion and Resident Unit Manager Unknown Niemie.

Plaintiff claims that he is the co-founder and Supreme Vanguard Minister of a newly formed religion called the "Noatic VOICE," which stands for Noatic Vanguard of Islamic and Community Empowerment. Plaintiff states that material sent to him by the Noatic VOICE office was not delivered to him. Plaintiff was subjected to harassment by Defendant John Mayotte, as well as other prison officials. On January 3, 2003, Plaintiff was told by the Chaplain that the Noatic VOICE religion had not yet been approved by the MDOC, but that it could be practiced individually. In mid-January, Plaintiff was called to the unit office by Defendants John Mayotte and Weisinger,

and was interrogated regarding the new religion. Defendant John Mayotte told Plaintiff that he believed the religion was a cover for a gang that Plaintiff had belonged to prior to incarceration, and that it had been designated as an STG.

Plaintiff alleges that on January 21, 2003, Noatic VOICE religious materials were sent to Plaintiff and other registered members of Noatic VOICE, but Plaintiff never received the materials. On February 7, 2003, Plaintiff filed a complaint in this court against Gerald Hofbauer for withholding the material. *See El-Shabazz v. Hofbauer*, Case No. 2:03-cv-28. Plaintiff states that he feared that he would be retaliated against because of this action. Plaintiff's case was dismissed for failure to exhaust administrative remedies. Plaintiff claims that Defendants John Mayotte, Dunn, and Weisinger caused another inmate to fabricate charges against Plaintiff and other Noatic VOICE members, stating that they were involved in prostitution and extortion, in order to justify designating the religion as an STG. Plaintiff states that the Chaplain's clerk was also harassed for reporting the unlawful actions of Defendants in fabricating stories about the Noatic VOICE. On May 9, 2003, Defendant John Mayotte began threatening individual Noatic VOICE members with STG designation. Defendant John Mayotte told Plaintiff that he did not have to worry about seeing the parole board because he would make sure that Plaintiff did not get parole. On May 13, 2003, Plaintiff was moved to another cell block and fired from his job. Plaintiff was placed in a cell between two STG members. Plaintiff began to tell his neighbors about the Noatic VOICE and to convince them to leave the gang life and embrace a spiritual life. Defendant John Mayotte discovered Noatic VOICE materials with Plaintiff's name on them in another prisoner's cell.

On June 1, 2003, Plaintiff was officially designated as an STG II member for associating with known STG prisoners. Consequently, Plaintiff was automatically denied parole. When Plaintiff requested an explanation, he was told that the information was part of an ongoing

investigation and was confidential. On June 13, 2003, Plaintiff and another prisoner were approached by Defendant John Mayotte, who told them that three known Vice Lords were members of the Noatic VOICE and that he would have no problem convincing the Director to designate the Noatic VOICE as an STG. Plaintiff subsequently began to receive letters from Noatic VOICE members around the state, seeking spiritual advice and further understanding of the beliefs espoused by the Noatic VOICE. These letters were initially read before being given to Plaintiff, and were eventually rejected altogether. Moreover, the authors of the letters were threatened with STG designation.

On July 10, 2003, Plaintiff had a scheduled meeting with another prisoner in the law library. Upon entering the library, Defendant Bott shook down Plaintiff's legal materials, and asked "What's all this gang stuff?" Plaintiff told Defendant Bott that it was religious material, and Defendant Bott stated, "Same thing." While Plaintiff was in the law library, Defendants Bott, Ninnis, Luokala, Havela, Etten and Champion, as well as eight unknown officers, shook Plaintiff's cell down. Plaintiff states that his property was all over the floor and scattered across the officers' desk following the shakedown. The majority of Plaintiff's property was then packed into a large duffel bag. Subsequently, while Plaintiff was in the shower, Defendant Bott went through Plaintiff's legal materials and removed several items, including materials relating to a civil rights action (2:03-cv-28), exhibits from Plaintiff's criminal case, evidence photographs, and news clippings. Defendant Bott also took all materials relating to the Noatic VOICE, such as rosters, addresses, books, files, literature, teachings, and a full membership list.

Plaintiff received a Notice of Intent (NOI), which stated that one duffel bag of suspected STG material was taken from Plaintiff's cell. Plaintiff complains that a proper accounting

was never made of the property taken, which prevented Plaintiff from asserting a proper defense. Plaintiff asserts that because the Noatic VOICE was not labeled an STG group at the time, there was no reason to believe the confiscated materials were STG related. Plaintiff claims that his property was improperly examined by Defendant John Mayotte prior to the hearing. On July 24, 2003, Plaintiff was called to Defendant Weisinger's office for a hearing, during which Plaintiff's duffel bag was produced. However, Plaintiff claims that most of the contents of the duffel bag were missing. Plaintiff was told that if he did not like it, he could write a grievance. Plaintiff was told that he would not be getting his property back, but that he could send it home after Defendant John Mayotte was done copying it. In addition, Defendant John Mayotte stated that he had sent a request to Lansing for the Noatic VOICE to be designated an STG. Defendant John Mayotte told Plaintiff that because he was a gang member and was listed as a founder and a minister of the Noatic VOICE, it must be treated as an STG. Defendant John Mayotte stated that prisoners could not be founders or ministers of a religion. Defendant John Mayotte further asserted that the fact that known members of the Vice Lords were members of the Noatic VOICE also contributed to him seeking to have the group labeled as an STG.

Plaintiff contends that the seizure of all of his Noatic VOICE materials prevented him from practicing his religion or from advising other members of the faith. Plaintiff states that during the shakedown, officers took his Holy Quar'an, but left a Bible, stating, "Here, you still got something to pray with." At the conclusion of the hearing on the NOI, Defendant Weisinger stated that the property had been viewed by Defendant John Mayotte, that approximately 20 pounds of the property was returned to Plaintiff, and that the remaining property was confiscated because it contained information on the Vice Lords. Plaintiff claims that his duffel bag was actually returned

- 4 -

to him containing no more than some loose papers, a few of his personal letters, and some state issued clothing that did not belong to Plaintiff. Moreover Plaintiff states that Defendant Weisinger never inspected the confiscated property. Plaintiff's grievance on this issue was denied and his step II appeal was denied by Defendant Hofbauer. Plaintiff eventually discovered that his step III appeal on this issue never left the institution.

On August 22, 2003, Defendant John Mayotte claimed that he had found an address of one of his relatives in Plaintiff's property. Defendant John Mayotte told Plaintiff that if Plaintiff kept "fucking with Mayotte," he would have him "stabbed again," but that this time Plaintiff would be killed. Plaintiff's grievance on this issue was rejected as being too vague. On August 27, 2003, Plaintiff filed a formal complaint against MBP officials with the Department of Civil Service. The complaint was forwarded to the Prisoner Affairs Department of the MDOC, which only caused Plaintiff to be further retaliated against.

On September 11, 2003, Plaintiff was packed up to be transferred. While in the property room, Defendant John Mayotte and his wife, Defendant Dawn Mayotte, began taking items of property and throwing them in the trash. Defendant John Mayotte told Plaintiff that he had been making harassing and threatening telephone calls to free world Noatic VOICE representatives in order to encourage them to cease support for Plaintiff and his religion. The Mayottes took pictures, letters and Plaintiff's phone/address book, stating that Plaintiff wouldn't mind them having the book, since Plaintiff had not minded having the Mayottes' address. A NOI was written mentioning the book, and it was kept by the Mayottes, who used it to contact people in the book. Once contacted by the Mayottes, the people listed in Plaintiff's book were told that he was an informant and/or a con-artist, and that they could be investigated as a result of their involvement with Plaintiff, who was

a convicted murderer. Plaintiff states that he never received a hearing on this NOI and that MBP officials lied about forwarding the property to AMF.

On September 30, 2003, Plaintiff allegedly received notice that the Noatic VOICE had been officially designated as an STG, and that Plaintiff had been labeled as an STG member. Plaintiff claims that this designation was improper, and merely relied upon the fact that some of the members of the Noatic VOICE were also members of the Vice Lords gang. Plaintiff claims that the STG designation means that he is automatically a level V maximum security prisoner. On September 13, 2004, Plaintiff filed a complaint attempting to assert his claims, but the complaint was dismissed for failure to exhaust administrative remedies. *See El-Shabazz v. Caruso, et al.*, 2:04-cv-186 (W.D. Mich. Oct. 28, 2004). Plaintiff claims that Defendants' conduct violated his constitutional rights. Plaintiff requests compensatory and punitive damages, as well as declaratory and injunctive relief.

Defendants move for summary judgment. Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the Plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad*

*v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Defendants Dunn, Dawn Mayotte, Luokala, Niemie and Ezrow argue that they were not personally involved in the allegations in Plaintiff's complaint entitling them to dismissal. A party cannot be held liable under Section 1983 absent a showing that the party personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the allegedly unconstitutional conduct. *See e.g. Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989), *cert. denied*, 495 U.S. 932 (1990); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir.), *cert. denied*, 459 U.S. 833 (1982). *See also Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied* 469 U.S. 845 (1984). Plaintiff has asserted sufficient allegations showing each Defendant's involvement. Defendants are not entitled to dismissal based upon lack of personal involvement when a question of fact remains at this point in the case regarding the extent of each Defendant's involvement in the allegations of Plaintiff's complaint.

Plaintiff alleges that he was denied due process of law by hearings officer Defendant Victoria Weisinger. In *Shelly v. Johnson*, 849 F.2d 228 (6th Cir. 1988), the court affirmed a decision of Douglas W. Hillman, then Chief District Judge of this court, holding that a hearings officer, when acting under MCLA § 791.251 -791.255, was entitled to absolute judicial immunity in relation to

actions taken in his capacity as hearings officer. Plaintiff argues that *Muhammad v. Close*, 379 F.3d 413 (6th Cir. 2001) as contrary authority for the proposition that a hearing officer can be sued for a due process violation. However, that case did not present a due process issue or a claim against a hearings officer. Accordingly, it is recommended that Defendant Weisinger be dismissed from this action. Moreover, Plaintiff has failed to establish a violation of his due process rights. Defendant Weisinger attests that Plaintiff was given the opportunity to review the suspected STG items. Specifically Plaintiff's Quar'an had STG references in it, including Vice Lord and VOICE references on the same page. Materials that were not suspected STG documents were returned to Plaintiff. Defendant has asserted that during the hearing, each paper was reviewed and a majority of the documents were returned to him. In the opinion of the undersigned, Defendant Weisinger is entitled to dismissal from this action.

Plaintiff alleges that Defendants violated his freedom of religion rights by confiscating his property and classifying him as an STG prisoner based upon his affiliation with his religious group the Noatic VOICE. Plaintiff brings his claim under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1. Section 2000cc-1 states:

(a) General Rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person–

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

This rule applies solely in cases where the "substantial burden is imposed in a program or activity that receives Federal financial assistance," or where the burden affects "commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. § 2000cc-1(b). Plaintiff alleges that Defendants have denied Plaintiff all Noatic VOICE materials and classified his religious group as an STG group. Defendants have asserted that the Noatic Voice is not a designated STG group. Plaintiff is an STG prisoner because of his involvement in the STG group the Vice Lords. Some of Plaintiff's Noatic VOICE materials were confiscated because those materials also contained descriptions of Vice Lord activities. Plaintiff argues that this is untrue and that Defendants have classified the Noatic VOICE as an STG group. As support for Plaintiff's assertion, Plaintiff points to exhibit 47 attached to his response brief which is a memorandum authored by Defendant Ezrow to Plaintiff regarding his STG status. The memorandum states in handwriting: "You were recently made an STG II for material labeled V.O.I.C.E. - you continue to be involved in this activity. You will not be interviewed for at least 6 mo to determine your involvement in this group." Attachment 6 to Plaintiff's response brief. Additionally in an Administrative Hearing Report Prison Counselor T. Arredia wrote "The letter was reviewed for the purpose of this hearing. A copy was made and present at the hearing as well. Inspector Ezrow has verified that VOICE has been designated as an STG. Therefore, any materials or correspondence relating to this organization is prohibited and shall be rejected. The letter contains several references to 'VOICE' and '199.' Both are identified as related to this STG." Attachment 8 to Plaintiff's response brief. In a grievance response dated August 23, 2004, Defendant Burnett wrote that "His continued involvement in V.O.I.C.E. (a designated STG) is the reason he is not being allowed a routine job assignment." Attachment 10 to Plaintiff's response brief. Defendant John Mayotte stated in his affidavit that Plaintiff had been designated STG II for his Vice Lord activities, and that

Plaintiff was not targeted for his Noatic VOICE activities. Further, Defendant Mayotte states that Noatic VOICE is not an STG. Defendant Ninnis submitted an affidavit that indicates that he conducted a shakedown of Plaintiff's cell on July 10, 2003 and removed suspected STG materials that contained references to VL - Vice Lords Voice, Inc., and documents and forms on how to raise funds for VOICE outside the prison.

Defendant Ezrow explained in his affidavit that Plaintiff is considered one of the highest ranking Vice Lords and allegedly holds the rank of Imperial Pharaoh. Plaintiff was originally classified as an STG I on December 9, 1999 and an STG II on September 20, 2000. On July 10, 2001, Plaintiff's STG status was removed. However, on September 20, 2001, Plaintiff was classified as an STG II because of his involvement with the Vice Lords. Defendant Ezrow explains the relationship between VOICE and the Vice Lords in this affidavit. Plaintiff was transferred from Marquette Branch Prison to the Baraga Maximum Correctional Facility on September 12, 2003. Plaintiff became involved in a written doctrine called VOICE which stands for Vanguard of Islamic Community Empowerment, also referred to as Noatic VOICE or Vanguard of Independent Community Empowerment. The VOICE doctrine was discussed with Plaintiff and he was informed that his continued involvement in STG activities would cause him continued STG designation. Plaintiff filed a grievance and was told that he would be classified as an STG prisoner as long as he was involved in any group related to the Vice Lords. On November 13, 2003, Vice Lord materials which originated from Plaintiff were found in another prisoner's cell. Plaintiff continued his VOICE /Vice Lord activities. It was discovered in Plaintiff's correspondence that Plaintiff held the rank of Supreme Vanguard Minister of the TVN which stands for Traveling Vice Lord Nation, a sect of the Vice Lords. A prisoner named Perkins, another known Vice Lord member, was identified as Plaintiff's administrative assistant. A Texas prisoner was noted to be involved in VOICE, which

established that Plaintiff was involved in national recruitment.  Plaintiff continued to be involved in VOICE so his STG status was continued.  Plaintiff sent a letter to a known Vice Lord leader on April 11, 2004.  Further, his address book was taken from him which contained many prisoner names. Forty-five names were known Vice Lord members and 13 names were other confirmed gang members. On April 24, 2004, Plaintiff was placed in segregation for failing to disperse during mass movement.  His segregation status appears to have limited his involvement in VOICE/Vice Lords, however his name continued to surface as the "shot-caller" for the Vice Lords.  Further, Defendant Ezrow explained that as inspector at AMF he did not have final authority to uphold or deny an STG designation.

It is apparent that Plaintiff was classified as an STG II prisoner due to his involvement in the VOICE/Vice Lords group.  Plaintiff asserts that VOICE is a religious organization and not involved with the Vice Lords.  However, it is clear that Plaintiff is unable in his own activities to separate these groups.  Defendants have established that Plaintiff uses VOICE activities to facilitate his Vice Lord activities.  Plaintiff cannot argue that his involvement with VOICE is not gang related when he is unable to separate his own gang activities from his affiliation with VOICE.  Defendants discovered that some of Plaintiff's VOICE materials contained references to Vice Lord activities. Those materials were confiscated.  Plaintiff's or Quar'an or Koran also contained references to Vice Lord activities.  Accordingly, it is clear that Defendants' conduct was appropriate.  It appears that Plaintiff is attempting to use the RLUIPA as a cover for his Vice Lord gang activities.  Plaintiff cannot establish that his gang related activities are religious.  Accordingly, it is recommended that plaintiff's RLUIPA claim be dismissed.

Plaintiff asserts that his increased classification violated his due process rights. Plaintiff asserts that his classification level increased with his STG status.  In *Sandin v. Conner*, 515

U.S. 472, 115 S. Ct. 2293 (1995), the Plaintiff alleged that prison officials deprived him of procedural due process by refusing to allow him to present witnesses during a disciplinary hearing and then sentencing him to segregation for misconduct. *Sandin*, 515 U.S. at 474, 115 S. Ct. at 2294. In reversing the Ninth Circuit's decision that the prisoner had a liberty interest in remaining free of disciplinary segregation, the Supreme Court abandoned the search for mandatory language in prisoner regulations as previously called for under *Hewitt v. Helms*, 459 U.S. 460 (1983), and ruled instead that it was time to return to the due process principles which were established in *Wolff v. McDonnell*, 418 U.S. 539 (1974), and *Meachum v. Fano*, 427 U.S. 215 (1976). *Sandin*, 515 U.S. at 483, 115 S. Ct. at 2300 (internal citations omitted).

In *Sandin*, the Supreme Court noted that in some cases, a restraint might be so extreme as to implicate rights arising directly from the Due Process Clause itself. *Sandin*, 515 U.S. at 483-484, 115 S. Ct. at 2300 (internal citations omitted). In addition, the Court recognized that States may create liberty interests protected by the Due Process Clause where the freedom from restraint imposed "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S. Ct. at 2300. However, such restraints are rare and do not include, for example, transfer into solitary confinement. *Sandin*, 515 U.S. at 486, 115 S. Ct. at 2301. Nor does placement in administrative segregation normally constitute such a hardship. *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir.), *cert. denied*, 522 U.S. 848 (1997); *Rimmer-Bey v. Brown*, 62 F.3d 789 (6th Cir. 1995). In addition, Plaintiff has no right to prison employment or to early release on parole. *Greenholtz v. Inmates, Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7 (1979); *Board of Pardons v. Allen*, 482 U.S. 369 (1987); *Sweeton v. Brown*, 27 F.3d 1162, 1164-65 (6th Cir. 1994), *cert. denied*, 513 U.S. 1158 (1995); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir.1989). Moreover, there is no

right under federal law allowing a prisoner to prevent a transfer to another facility or giving him any choice concerning the facility where he will be incarcerated. *Meachum*, 427 U.S. at 223-29[1]; *Olim v. Wakinekona*, 461 U.S. 238 (1983).

A plaintiff seeking to allege a procedural due process violation based on a state created liberty interest must not only show it is derived from mandatory language in a regulation, but also that it imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S. Ct. at 2300; *Rimmer-Bey*, 62 F.3d at 790-791. Pursuant to *Sandin*, "a liberty interest determination is to be made based on whether it will affect the overall duration of the inmate's sentence, and there is no evidence here that the segregation will impact Plaintiff's sentence." *Jones*, 155 F.3d at 812. The Sixth Circuit has determined that a prisoner's placement in administrative segregation for over a year is not an atypical or significant hardship as to create a liberty interest in due process. *Mackey v. Dyke*, 111 F.3d 460, 461-63 (6th Cir.), *cert. denied*, 522 U.S. 848 (1997). Because Plaintiff cannot establish that his increased classification due to his STG activities constitutes an "atypical and significant hardship," it is the opinion of the undersigned that Plaintiff's claim that he was denied procedural due process is without merit.

Similarly, it is the opinion of the undersigned that Plaintiff cannot establish a violation of his equal protection rights, because Plaintiff rights were not denied by Defendants' conduct. The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a

---

[1] In *Meachum v. Fano*, 427 U.S. 215, 223-229 (1975), the Court held that transfers between prisons of different severity, such as between a medium security prison and a maximum security prison, did not deprive the prisoner of liberty within the meaning of the Due Process Clause.

direction that all persons similarly situated should be treated alike. U.S. CONST., amend. XIV; *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). It is apparent that Plaintiff's STG activities resulted in his STG designation and affected his asserted religious activities. Contrary to Plaintiff's assertion, it is not his religious activities that caused his STG designation or the confiscation of his religious documents. Plaintiff's STG designation was related to his Vice Lord activities which Plaintiff was unable to separate from his purported religious activities. Plaintiff's asserted religious materials were confiscated because they contained references to the Vice Lords. Plaintiff has failed, in the opinion of the undersigned, to establish a violation of his constitutional rights.

Plaintiff has also asserted that Defendants retaliated against him. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, in least in part, by the protected conduct. *Thaddeus-X*, 175 F.3d at 394. Moreover, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the Defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Defendants have established that Plaintiff continued to pose an STG threat. Any interference with Plaintiff's religion

was a direct result of Plaintiff's inability to separate his purported religious activities with his Vice Lord leadership. Plaintiff has failed to show that Defendants took any retaliatory action.

Defendants argue that they are entitled to qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

When determining whether a right is clearly established, this court must look first to decisions of the United States Supreme Court, then to decisions of the Sixth Circuit and to other courts within this Circuit, and finally to decisions of other circuits. *Dietrich*, 167 F.3d at 1012. An official action is not necessarily protected by qualified immunity merely because the very action in question has not previously been held to be unlawful. Rather, in light of pre-existing law, the unlawfulness of the official's conduct must be apparent. *Dietrich*, 167 F.3d at 1012; *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

When making a qualified immunity analysis, the facts must be interpreted in the light most favorable to the Plaintiff. Part of the analysis is to determine whether there are any genuinely disputed questions of material fact. *Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998). Where there is a genuinely disputed question of fact, it is for the trier of fact to resolve, not the judge. "This would be true notwithstanding that the trial judge found the [defendant] officer to be more credible

than the Plaintiff because it is not for the court to make credibility determinations at this stage of the proceeding." *Id.*

The operation of the qualified immunity standard depends substantially upon the level of generality at which the relevant legal rule is to be identified.

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of the pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 639-40. *See also Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996), *cert. denied*, 520 U.S. 1157 (1997).

The Sixth Circuit has observed:

> A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred.

*Durham*, 97 F.3d at 866 (citing *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)).

Thus qualified immunity is not triggered only where the very action in question was previously held unlawful. *Anderson*, 483 U.S. at 639-40. Rather, the test is whether the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violated Plaintiff's federal rights. *Id.*

Furthermore, a defendant need not actively participate in unlawful conduct in order to be liable under Section 1983. Rather, a defendant may be liable where he has a duty to protect a plaintiff and fails to comply with this duty. *Durham*, 97 F.3d at 866-868 (holding that a nurse and a security guard at a state hospital may be liable under Section 1983 where they do not take action to prevent a patient from being beaten). *See also McHenry v. Chadwick*, 896 F.2d 184 (6th Cir.

1990)(a correctional officer who observes an unlawful beating may be liable under Section 1983 even though he did not actively participate in the beating), and *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), *cert. denied sub nom*, *Bates v. Bruner*, 459 U.S. 1171 (1983)(police officers who stood by and observed an unlawful beating by fellow officers could be held liable under Section 1983).

When faced with a qualified immunity defense, the court must first determine whether or not the Plaintiff has stated a claim upon which relief can be granted. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *Turner*, 119 F.3d at 429. If the court answers that question in the affirmative, the court goes on to determine whether or not the right allegedly violated was clearly established. *Turner*, 119 F.3d 425. These are both purely legal questions. The immunity issue should not be resolved if there are factual disputes on which the issue of immunity turns such that it cannot be determined before trial whether the Defendants' conduct violated clearly established rights. *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991). Plaintiff has failed to show that any of the Defendants violated his constitutional rights. Plaintiff's classification and restrictions were imposed due to his own behavior as an STG prisoner. Defendants are entitled to dismissal of this action.

Plaintiff has filed a motion for a preliminary injunction and temporary restraining order to prevent prison officials from retaliating against him. Plaintiff asserts that he was transferred improperly back to MBP from AMF despite having a pending legal action against employees who work at MBP. Plaintiff's request for relief is clearly without merit. The issuance of preliminary injunctive relief is committed to the discretion of the district court. *Planned Parenthood Association v. City of Cincinnati*, 822 F.2d 1390, 1393 (6th Cir. 1987). In exercising that discretion, the court must consider and balance four factors:

> 1. Whether the movant has shown a strong or substantial likelihood or probability of success on the merits.
>
> 2. Whether the movant has shown irreparable injury.
>
> 3. Whether the preliminary injunction could harm third parties.
>
> 4. Whether the public interest would be served by issuing a preliminary injunction.

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994). These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be carefully balanced by the district court in exercising its equitable powers. *Id.*

Moreover, where a prison inmate seeks an order enjoining state prison officials, this Court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Kendrick v. Bland*, 740 F.2d 432 at 438, n.3, (6th Cir. 1984). *See also Harris v. Wilters*, 596 F.2d 678 (5th Cir. 1979). It has also been remarked that a party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319 (2d Cir. 1969), *cert. denied*, 394 U.S. 999 (1969). *See also O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1986).

Plaintiff's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his Section 1983 action. *NAACP v. City of Mansfield, Ohio*, 866 F.2d 162, 167 (6th Cir. 1989). A review of the materials of record fails to establish a substantial likelihood of success with respect to Plaintiff's claim that the Defendants have violated his federal rights. Plaintiff has failed to establish a violation of any of constitutional rights. Furthermore, Plaintiff has failed to establish that he will suffer irreparable harm absent injunctive relief. Moreover, it is recommended that Defendants be granted summary judgment in this action.

Finally, in the context of a motion impacting on matters of prison administration, the interests of identifiable third parties and the public at large weigh against the granting of an injunction. Any interference by the federal courts in the administration of state prison matters is necessarily disruptive. The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights. *See Glover v. Johnson*, 855 F.2d 277, 286-87 (6th Cir. 1988). That showing has not been made here. Because Plaintiff has failed to meet the heavy burden establishing the need for injunctive relief, I recommend that Plaintiff's motion for a temporary restraining order be denied.

Accordingly, it is recommended that Defendants' motion for summary judgment (Docket #26) be granted dismissing this case. It is further recommended that Plaintiff's motion for preliminary injunction and temporary restraining order (Docket #25) be denied.

Further, if the court adopts this recommendation the court should decide that an appeal of this action would not be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the court grants Defendants' motion for summary judgment, the court can discern no good-faith basis for an appeal. It is recommended that should the Plaintiff appeal this decision, the court assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he should be required to pay the $455 appellate filing fee in one lump sum.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal.

*United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

                 /s/ Timothy P. Greeley
                 TIMOTHY P. GREELEY
                 UNITED STATES MAGISTRATE JUDGE

Dated:   October 5, 2006